IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


SAMANTHA FURGASON,

                    Plaintiff,

        vs.                                             No. CIV 02-906 LFG/LAM

OFFICER DANNY VALDEZ, et al.,

                    Defendants.


**MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT DANNY VALDEZ'S MOTION FOR
PARTIAL SUMMARY JUDGMENT No. II**

        THIS MATTER comes before the Court on Defendant Danny Valdez's ("Valdez") Motion

for Partial Summary Judgment No. II Which Seeks the Dismissal of Plaintiff's Fourteenth Amendment

Privacy, Sexual Equality, Equal Protection and Substantive Due Process Claims on the Basis of

Qualified Immunity [Doc. 50], filed herein on July 10, 2003.  Plaintiff filed a "Combined Response"

[Doc. 55] to this motion and to another of Valdez's motions for partial summary judgment,[1] and

Valdez filed his Reply [Doc. 59].  Oral argument is not necessary.  For the reasons given below, the

motion is granted in part, and denied in part.

_____

        [1]The practice of filing a combined response to two separate summary judgment motions is not proper.
*See*, Administrative Order Misc. 92-88 (May 4, 1992).  On the other hand, the Court questions why Defendant
Valdez filed two separate summary judgment motions when the issues raised in the two motions are intertwined.
If the purpose was to avoid the page limitation on motions, D.N.M.LR-Civ. 7.7, then this practice is improper.
The Court will consider Plaintiff's submissions on this occasion, but Plaintiff is put on notice that in the future,
separate responses should be filed to separate motions.  So, too, Defendant is advised that separate motions
for related issues should not be filed.

## **Factual and Procedural Background**

Plaintiff Samantha Furgason ("Furgason") filed a complaint in state court against Valdez, based on actions he allegedly took while employed as a police officer with the City of Santa Fe. Furgason claims that in February 2000, Valdez observed her as she was using an urban walking trail in Santa Fe and began stalking her.  She alleges that he obtained personal information about her by calling the police dispatcher and having her vehicle registration examined.  Valdez admits that, after seeing Furgason on the trail, he called the police dispatcher and traced Furgason's vehicle registration in order to find out who she was.

On February 24, 2000, Valdez placed a note on Furgason's car.  The note read, "On Monday, right here, I saw you with your sweat pants down & you were adjusting your black panties.  I can't stop thinking of you.  You do have a beautiful body & keep up the good work."  [Doc. 55, Ex. 6]. Valdez admits putting this note on Furgason's car.  Furgason says that, upon reading the note, she looked around the area and noticed a car parked across the street from her.  She was sufficiently alarmed that she called the police and reported the incident.

Furgason further alleges that, on February 24, 2000, after she reported the note-placing incident, she began receiving a series of phone calls, "blocked" so that she could not tell who was calling.  The caller hung up each time without speaking.  Valdez denies that he placed calls or did any actions that could be characterized as stalking.

Furgason asserts that, on February 28, 2000, two of her friends parked her car at the walking trail and saw Valdez "cruise" her vehicle twice.  She says the friends followed Valdez, who turned on his flashing light and ran a red light in order to evade them, and that when Furgason's friends gave a description of the vehicle and its plates to the Santa Fe Police Department, the information matched

Danny Valdez.  Valdez denies running a red light but does admit that he drove by Furgason's car twice.

Furgason alleges that she received another series of hang-up calls, and that on March 1, 2000, Valdez followed her in his vehicle as she drove in town on an errand to her bank.  She testified in her deposition that Valdez was driving a gold pickup truck at the time, and that he aggressively tailgated her car and followed her home, driving into the alley that led to her house and then parking in a lot nearby.  [Doc. 55, Ex. 5, at 116-119].  Valdez denies these stalking allegations.  Furgason alleges that she was told by the State Police that in the event of an emergency involving the stalker she should not call 911, which presumably would connect her to the city police, but should instead contact State officials, because "they weren't sure who they could trust."  [Doc. 55, Ex. 5, at 169].

The case was removed to federal court by defendants.  Valdez answered the complaint and thereafter filed two motions for summary judgment.  The current motion (Motion for Summary Judgment No. II) concerns Furgason's claims of constitutional violations under the Fourteenth Amendment.  A companion motion (Motion for Summary Judgment No. I) [Doc. 49] is based on Furgason's claims under the Eighth, Ninth, and Tenth Amendments, as well as her claims under state law.  A Memorandum Opinion and Order on Valdez's Motion for Summary Judgment No. I is also filed on this date.

## Standards for Summary Judgment and Qualified Immunity

A summary judgment proceeding is appropriately used to cut through the allegations of the pleadings and determine if there is a triable issue.  Summary judgment will be granted when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress

& Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995).  The court does not decide the issues of fact, but rather determines if there is an issue that must be resolved at trial.  In considering a motion for summary judgment, the Court examines the factual record and the reasonable inferences therefrom in the light most favorable to the party opposing the motion.  Foster v. Alliedsignal, Inc., 293 F.3d 1187 (10th Cir. 2002).

When a summary judgment motion raises the defense of qualified immunity on behalf of an individual defendant, "the plaintiff must show that the law was clearly established when the alleged violation occurred and come forward with facts or allegations sufficient to show that the official violated the clearly established law.  Then the defendant assumes the normal summary judgment burden of establishing that no material facts that would defeat his claim for qualified immunity remain in dispute."  Woodward v. City of Worland, 977 F.2d 1392, 1396-97 (10th Cir. 1992).

> Qualified immunity shields government officials from the burdens of lawsuits stemming from the exercise of discretionary authority, yet it also allows for the vindication of constitutional rights ... In striking a balance between these two competing goals, the Supreme Court has formulated a test based on the "objective reasonableness" of the conduct at issue as compared with the state of the law at the time of the alleged violation ...  Under this test, the burdens of a trial and personal liability may not be imposed on a government official for the exercise of discretionary authority unless his conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."

Jantz v. Muci, 976 F. 2d 623, 627 (10th Cir. 1992).

The official's unlawfulness must be "apparent in light of the preexisting law," but the particular action in question need not previously have been held unlawful.  Eastwood v. Dept. of Corrections, 846 F.2d 627, 630 (10th Cir. 1988).  "Instead, we merely require the parties to make

4

a reasonable application of existing law to their own circumstances." Johnson v. Martin, 195 F.3d 1208, 1216 (10th Cir. 1999). To prevail on summary judgment once a defendant raises this defense, plaintiff must demonstrate some correspondence between the defendant's conduct and prior law allegedly establishing that the defendant's actions were clearly prohibited. Jantz, at 627.

### Discussion

Valdez seeks dismissal of Furgason's claims under the Fourteenth Amendment. These claims are based on: (1) her constitutional right to privacy; (2) substantive due process; and (3) equal protection of the laws.

The Court finds that Furgason has made out claims sufficient to take to the jury on her privacy and equal protection causes of action, and Valdez's motion will be denied as to those claims. However, "the standard of conduct required to state an equal protection [or privacy] claim is less demanding than the conscience-shocking standard applicable to a substantive due process claim," SH.A v. Tucumcari Mun. Sch., 321 F.3d 1285, 1287 (10th Cir. 2003), and the Court finds that Furgason's allegations against Valdez do not meet this stringent standard. Valdez's motion will therefore be granted as to the substantive due process claim.

### A.  Constitutional Right to Privacy

Furgason alleges that Valdez violated her "rights of privacy guaranteed under the Eighth Amendment." [Complaint, Doc. 1, Ex. A, at ¶ 22]. The parties are in agreement that the Eighth Amendment is not applicable in this case, as the Eighth Amendment imposes limitations on excessive fines and imposition of cruel and unusual punishment on those found guilty of crimes. Furgason is not a convicted prisoner. Conceding her error, Furgason asks the Court to consider her privacy claim under the Fourteenth Amendment instead [see Doc. 55, at 21]. The Court will do so, as the original

5

Complaint adequately alleges Fourteenth Amendment violations.

            1.   Elements of the Claim for Violation of Constitutional Privacy Rights

A party bringing a claim under 42 U.S.C. § 1983 must satisfy two elements:  (1) the party must demonstrate that some person deprived him of a federal right; and (2) the person who deprived him of the federal right acted under color of law.  Gomez v. Toledo, 446 U.S. 635, 640, 100 S. Ct. 1920, 1923 (1980); West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55 (1988).

With regard to the "color of law" element, it is undisputed that Valdez was a city police officer.  [Doc. 50, at 5, ¶ 1].  It is also clear that Valdez's access to vehicle registration information was accomplished by use of his authority as a police officer.  Vehicle registration information like this is not available to a citizen by the simple act of calling police dispatch for a "10-28" [a request for vehicle registration information].  Thus, it was only by virtue of Valdez's authority as a city police officer that he had ready access to Plaintiff's personal information.  The other alleged actions, while less obviously performed under color of state law, are causally linked to and inextricably intertwined with the alleged acts that allowed Valdez's access to Plaintiff's name and address.  The Court finds that the "color of law" element is satisfied.[2]

Plaintiff must also establish that Valdez's conduct deprived her of her constitutional right to privacy.  The Court finds that there is sufficient evidence to go to the jury on this element as well.

"While the Constitution does not explicitly establish a right of privacy, the Supreme Court has recognized for nearly 100 years that a right of personal privacy does exist."  Eastwood v. Dept. of Corrections, 846 F.2d 627, 630 (10th Cir. 1988).  The right of privacy is founded in the Fourteenth

---

    [2]This issue is discussed in greater detail in connection with the Equal Protection claim; *see* Subhead B, below.

Amendment's concept of personal liberty. Roe v. Wade, 410 U.S. 113, 153, 93 S. Ct. 705, 727 (1973). Our own Circuit has discussed the constitutional basis for this right:

> In a series of cases, the [U.S. Supreme] Court established a zone of privacy protected by the penumbra of a variety of provisions in the Bill of Rights . . . [including the First Amendment, the Fourth and Fifth Amendments, the general penumbra of the Bill of Rights, and the Fourteenth Amendment's concept of personal liberty and restriction upon state action]. This penumbra protects . . . the individual from governmental inquiry into matters in which it does not have a legitimate and proper interest.

Eastwood, *supra*, at 630-31 & n. 631 n.1 (10th Cir. 1988). Furgason alleges that her constitutionally protected right of privacy was violated by Valdez, who obtained private and personal information by use of his authority under law. The breach of this right may be vindicated in an action under 42 U.S.C. § 1983. Eastwood, at 630.

As noted above, the concept of constitutionally protected privacy encompasses, *inter alia*, "the individual interest in avoiding disclosure of personal matters." Whalen v. Roe, 429 U.S. 589, 599-600, 97 S. Ct. 869, 876 (1977). This case involves Furgason's interest in avoiding disclosure to unwanted persons of certain personal information, including her name and identity. Information which a person wishes to keep confidential will be protected by a constitutional right to privacy if: (1) she has a reasonable expectation of privacy in the information; and (2) her individual privacy interest outweighs any public interest in disclosure. Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 458, 97 S. Ct. 2777, 2797-98 (1977); Slayton v. Willingham, 726 F.2d 631, 635 (10th Cir. 1984).

Valdez does not dispute that he used police resources to trace Furgason's vehicle registration in order to find out her name. [Doc. 50, at 5, ¶ 2]. Valdez did not do this for any legitimate law enforcement purpose; rather, he noticed Furgason as she was working out in a public place, saw her

adjusting her running clothes and thought she had "a beautiful body," and couldn't stop thinking of her. [Doc. 50, at 5, ¶ 2; Doc. 55, Exs. 6, 7]. He called police radio dispatch for a "10-28" and "10-29."[3] This was done to find out who she was. Valdez came back a few days later to the site where he first saw Furgason and left the above-described note on her car. [Doc. 49, Exs. A, B; Doc. 50, at 5, ¶ 2; Doc. 50, at 6, 5].

Valdez himself characterizes his actions as, "an officer, who, on two occasions, watched a woman he found attractive when she was in public, left a note on her car when it was parked in a public place indicating he had previously seen her and thought she had a beautiful body, and ran her license plate to determine her name." [Doc. 50, at 21]. Valdez was not, and does not even contend that he was, acting in the public interest in running Furgason's vehicle registration. He was investigating no crime; he was not looking into suspicious criminal behavior; he was not "serving and protecting." Rather, he was simply using his authority as a police officer, as well as public resources and personnel, to satisfy his own curiosity. It is unclear what his ultimate purpose was. Did he intend to use this information to introduce himself and ask Furgason for a date? Did he intend, as Furgason alleges, to harass and stalk her? If Furgason can establish that she had a legitimate expectation of privacy in her personal information, there will be no need to balance her interest against the public interest in legitimate law enforcement activity, since no such legitimate activity is apparent under these facts.

Valdez argues that Furgason did not have a legitimate expectation of privacy in the information he obtained from police dispatch when he asked for a trace of Furgason's vehicle

---

[3]Under the police "Ten Code System," a "10-28" is a request for vehicle registration information. The registration will provide the name and address of the registered owner, and the make, model and vehicle identification number of the car. A "10-29" is a request for outstanding warrants on the registered owner.

registration so that he could learn the identity of a woman whose body he admired. He argues that the information at issue must be of a "personal or intimate nature," and information that is otherwise readily available to the public is not constitutionally protected. Indeed, to a degree, Valdez is correct. Had he learned of her identity through some public source, such as simply looking up Furgason's name and telephone number in a phone directory, Furgason would be hard pressed to argue that she had a legitimate expectation of privacy in that information. But that is not what occurred. Valdez obtained information in a manner not available to the public, and it was the information so obtained that provided Valdez with knowledge of Furgason's identity and address.

Valdez also contends that Furgason "did not have a reasonable expectation of privacy in not being seen or contacted by note when she was out in public." This, too, is arguably correct. Furgason would have difficulty arguing that her privacy had been violated if someone simply saw her openly and publicly adjust her sweat pants so that her undergarments were momentarily visible. The public has no obligation to refrain from seeing what is open view, and while such conduct may be a breach of social etiquette, it is not unlawful.

Referring to Furgason's allegations that Valdez engaged in "stalking" her by following her as she drove around town, blocking her exit in the alleyway near her home, and calling her at home and hanging up on numerous occasions, Valdez further argues that Furgason does not have a legitimate expectation of privacy as she drives about the public streets, nor does she have a legitimate expectation of privacy in her home phone number and address, as this information is published in the Santa Fe phone book. These arguments, while somewhat persuasive, are not determinative.

The Court finds Plaintiff's arguments more persuasive. The undisputed facts are that Valdez abused his position as a police officer by using the power of his police authority to obtain Plaintiff's

9

vehicle registration information in order to find out her identity, without any legitimate law enforcement need to do so.  Valdez acknowledges that he saw a woman in a public place, admired her body, and thereupon decided to use police resources, which were available to him because of his position as a police officer, to find out who she was and perhaps, as Plaintiff alleges, to follow and stalk her.  Plaintiff's position is that "Samantha Furgason's identity was not public information, nor publicly available" [Doc. 55, at 22] and, given the method and manner in which the information was obtained, the Court agrees.

The elements of a cause of action for violation of constitutional privacy rights are: (1) plaintiff had a legitimate expectation of privacy in the information; and (2) there is no public interest in disclosure of the information which outweighs plaintiff's privacy interest.  Slayton v. Willingham, supra, at 635.  Whether the plaintiff had a legitimate expectation of privacy, under the particular facts of a given case, is a matter for the jury to determine.  Sheets v. Salt Lake County, 45 F.3d 1383, 1388 (10th Cir. 1995).  While it is possible, even probable, that a jury could decide that Valdez would not have a legitimate expectation of privacy in her vehicle registration information under other circumstances, for example, if she were violating traffic laws at the time or even, perhaps, if Valdez had traced her registration simply to satisfy his idle curiosity.  The Court need not decide these issues, because that is not what is alleged in this case.  Instead, Plaintiff alleges that Valdez traced her registration in order to use the information so obtained in order to stalk and harass her.  As discussed below, she has supplied sufficient evidence to allow the jury to decide whether this was, indeed, Valdez's purpose, and whether under these circumstances, Furgason had a legitimate expectation of privacy in the information.

Valdez cites several cases to support his argument that Furgason could have no legitimate

expectation of privacy under the circumstances of this case; however, these cases are inapposite to the present case.  It is true that information readily available to the public is not protected by the constitutional right to privacy.  Nilson v. Layton City, 45 F.3d 369, 372 (10th Cir. 1995). However, the fact that Furgason's address and phone number are listed in a public telephone directory is not determinative in this case since, as Plaintiff points out, "The critical point is that Danny Valdez did not know Ms. Furgason's name when he began stalking her, because it was not public information, and therefore he had not way of learning her address or anything else about her absent illegally running her plate."  [Doc. 55, at 23].

Defendant cites Kallstrom v. City of Columbus, 165 F. Supp. 2d 686 (S.D. Ohio 2001) for the proposition that addresses are part of the public domain, and "[a]nyone with an individual's name and either Internet access or the initiative to visit a local government office can scan county property records, court records, or voter registration records for such information as an individual's address . . ." Id., at 695.  Here, however, Valdez did not have Furgason's name and therefore could not have availed himself of public access information relating to Furgason. This case merely strengthens Plaintiff's argument that it was the act of obtaining her name -- her identity -- that undergirds her allegation of a privacy violation, especially as the Kallstrom court emphasized the fact that the plaintiffs in that case "voluntarily revealed their own identities . . . [and as] plaintiffs have revealed their identities, their addresses are easily accessible in the public domain."  Id., at 695-96.  Here, Furgason revealed neither her identity nor her address to Valdez.

Valdez also cites two cases with fact patterns somewhat similar to the present case, to support his argument that a police officer's use of law enforcement resources to obtain personal information about an individual, without a legitimate reason in the public interest for doing so, does not amount

to a constitutional violation of the individual's privacy rights.

In Kelly v. City of Sterling Heights, No. 90-1895, 1991 WL 207548 (6th Cir. 1991), plaintiff brought a § 1983 action against a police officer, alleging that he used the Law Enforcement Information System ("LEIN") computer network to obtain her address and telephone number in order to sexually assault her. In an unpublished opinion, the court found that the plaintiff had no legitimate expectation of privacy in the information. And in Cline v. Rogers, 87 F.3d 176 (6th Cir. 1996), the plaintiff alleged that a county sheriff responded to a private citizen's request for information about plaintiff's arrest record, by searching state and local records and requesting a computer search of the National Crime Information Center ("NCIC") records, then revealing this information to the third party. The court found no constitutional violation, because "there is no constitutional right to privacy in one's criminal record." Id., at 179.

The Court does not find these cases persuasive. Furgason, unlike the plaintiff in Cline, is not asserting a right to privacy in her criminal record. In addition, both Cline and Kelly arose in the Sixth Circuit, a jurisdiction which has a more restrictive view of constitutional privacy than does the Tenth Circuit. See, Bloch v. Ribar, 156 F.3d 673, 683-84 (6th Cir. 1998) ("Unlike many other circuits, this court has narrowly construed the holdings of Whalen and Nixon to extend the right to informational privacy only to interests that implicate a fundamental liberty interest"). The Tenth Circuit takes a broader view of the constitutional right to privacy, construing Whalen and Nixon to establish "that the constitutional right to privacy encompasses an 'individual interest in avoiding disclosure of personal matters,'" and applying a balancing test which weighs the privacy right advanced by plaintiff against the public interest in disclosure of the information. Slayton v. Willingham, *supra*, at 635.

A more compelling precedent than the Sixth Circuit cases cited by Valdez is the Tenth Circuit's own Eastwood v. Dept. of Corrections, 846 F.2d 627 (10th Cir. 1988).  In that case, plaintiff sued corrections officials under § 1983, asserting they attempted to cover up an incident in which plaintiff was allegedly sexually assaulted by a fellow corrections department employee.  The plaintiff alleged that defendants forced her to reveal details of her sexual history in the course of investigating the incident, and then created an offensive work environment by continuing to harass her with questions about her sexual history and by publishing offensive and insulting drawings within the workplace and making offensive remarks about plaintiff to her co-workers.  The Tenth Circuit found this behavior, if true, would be a violation of plaintiff's constitutionally protected right of privacy, and it reversed the district court's dismissal of her complaint on grounds of qualified immunity.

In so ruling, the Tenth Circuit held that the privacy interest in avoiding disclosure of personal matters "protects the individual from governmental inquiry into matters in which it does not have a legitimate and proper interest [*citing* Whalen].  'The right to be left alone,' the Supreme Court has said, is 'the right most valued by civilized men.' . . .  Following this venerable precedent, this circuit has invoked the right of personal privacy against intrusion by the state on a number of occasions."  Eastwood, at 631.

Valdez also argues that Furgason had no reasonable expectation of privacy in driving about on public streets, and therefore her allegations that Valdez tailgated her, followed her from home to the bank, parked outside her house, and even drove into her alleyway and blocked her from leaving,

13

are not actionable because these alleged events occurred on public streets.[4] If Valdez was responsible for this conduct, it came after and was a result of his initial violation of Furgason's privacy rights, which occurred when he used his position as a police officer to tap into public law enforcement resources in order to ferret out the identity of a private person and inject himself, uninvited, into her life.  At the time Valdez first saw Furgason, and later when she was going about doing her errands, she was not engaging in illegal or even suspicious activity but was simply moving about in public, which she had every right to do.

The Court finds, therefore, that Furgason had raised a genuine issue of fact as to whether she had a reasonable expectation of privacy in her identity under the circumstances of this case, and that she asserts a viable claim that Valdez violated her constitutional right to privacy when he abused his authority as a police office to discover her identity and thereafter, allegedly, to follow her as she went about her private business and to stalk and harass her with repeated phone calls and unwanted visits to her home.  There being no public interest in Valdez's actions to balance against Furgason's privacy rights,  the Court finds that Furgason has made out a case, sufficient to take to the jury, that Valdez

---

[4]Valdez also argues that Plaintiff has produced no evidence that he was the person who did the tailgating, following, parking, etc.. The Court finds that Plaintiff's evidence in this regard, while not conclusive and largely circumstantial, is sufficient to allow a jury to decide whether it was Valdez who was doing the described stalking. Furgason testified in her deposition that these events, including the numerous blocked hang-up calls, began occurring on the same day that she found the note on her car, which Valdez admits writing, and in which he comments on her body, tells her he saw her adjust her black panties, and states that he can't stop thinking about her.  He admits that he returned at least once to the spot where he first saw her, and that he drove by her car at least twice.  Furgason testified that she had additional encounters with someone who looked like Valdez, following her in her car and parking outside her house.  She was told by the state police that if she needed help, she should call state officials rather than 911, because "they weren't sure who they could trust." [Doc. 50, Ex. A; Doc. 55, Ex. 4].  The jury should be allowed to decide whether it is a reasonable inference from these facts that Valdez was stalking Furgason.

violated her constitutional right to privacy under the Fourteenth Amendment.[5]

2. Qualified Immunity

Valdez argues, however, that he is entitled to qualified immunity on Furgason's privacy claims. "To determine the applicability of a qualified immunity defense, [the] . . . court must examine if the official conduct at issue 'violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Eastwood, supra, at 630, quoting from Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).

Valdez contends that at the time of these events, in early 2000, the privacy right which Plaintiff asserts was not clearly established and a reasonable police officer in his position would not have known that what he was doing violated Furgason's constitutional rights.  The Court rejects this argument, finding that "[t]he contours of the right . . . [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987).

> Definitions of what constitutes a clearly established right have been hazy.  However, the Supreme Court recently held that recovery under § 1983 will only be allowed if the official's unlawfulness is apparent in light of the preexisting law . . .  The particular action in question, however, need not have previously been held unlawful . . .  Nor must there even be a strict factual correspondence between the cases

_____

[5]The Court emphasizes that is does not, by this ruling,  imply a per se test whereby every policeman who traces a vehicle registration runs the risk of violating the vehicle owner's constitutional right to privacy, unless the officer can demonstrate a legitimate law enforcement reason for doing so.  Rather, the Court finds only that the right to privacy could be violated under the particular circumstances of this case, where an officer admits that he used a police dispatcher to track the vehicle registration of a woman whom he found attractive and to whom he had written a sexually suggestive note, and where the woman was immediately thereafter stalked and harassed by mysterious anonymous phone calls and incidents of tailgating and surveillance, under conditions raising an inference that the police officer was the person responsible for the acts of stalking and harassment.  It is up to the jury to decide whether, under these circumstances, Furgason had a legitimate expectation of privacy in her registration information.

> establishing the law and the case at hand . . .  Rather, this circuit
> requires only 'some but not precise factual correspondence.'

Eastwood, at 630.

As of 1986, the Tenth Circuit held in Mangels v. Pena, 789 F.2d 836 (10th Cir. 1986), that information of an intimate or otherwise personal nature, that is, information which "implicate[s] any aspect of personal identity" may be constitutionally protected.  Id., at 839.  And Eastwood itself, decided in 1988, held that in the Tenth Circuit the constitutional right to privacy encompasses, *inter alia*, a "right to be left alone."  The court in Eastwood rejected a qualified immunity defense for state officials who inappropriately pried into the sexual history of a state employee, and who sexually harassed the employee by publishing offensive and insulting drawings about her within the facility and by continuing to ask her offensive questions relating to her sexual background.

In July 2000, the Tenth Circuit cited Eastwood in noting that "[i]t was also clear [as of 1988] that ordinary citizens had the right to be free from the disclosure of personal information for an improper purpose, such as sexual harassment."  Herring v. Keenan, 218 F.3d 1171 (10th Cir. 2000).  It is beyond dispute that a reasonable officer in Valdez's position would have realized that it was not a valid use of law enforcement resources to obtain personal information on a law-abiding citizen for an improper purpose unrelated to any governmental interest.  The Court finds that, in light of Eastwood, a reasonable officer in Valdez's position in early 2000 should also have been aware that using his public office to obtaining personal information about a person for purposes of sexual harassment would constitute a violation of her constitutional rights to privacy.  Valdez is not entitled to qualified immunity on Furgason's Fourteenth Amendment privacy claim.

B. **Equal Protection**

Furgason alleges in her complaint that Valdez's actions violated her "rights to sexual equality and equal protection of the laws" guaranteed by the Fourteenth Amendment.  The Court  considers this claim under principles of equal protection.  Furgason argues that she has been treated differently from others similarly situated, in that  Valdez "purposely discriminated against her because of her sex."[6]

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985).  Plaintiff contends that Valdez singled her out and treated her differently because of her sex, and that "[n]o man similarly situated would have been treated the same by Danny Valdez."  Defendant argues, however, that Furgason cannot bring an equal protection claim against Valdez, because he was neither her supervisor nor did he exercise any state-derived authority over her.  Valdez argues that the law in this regard was clearly established as of early 2000, the date of the incidents at issue herein.  Valdez also argues that Plaintiff "never sought information from Detective Valdez about his treatment of men" [Doc. 59, at 10] and therefore has not shown that Valdez would have behaved differently toward Furgason if she had been

[6]Furgason argues, in the alternative, that Valdez violated her equal protection rights in that his actions indicate that he "harbored a malignant animosity toward her."  The latter claim is based on her allegation that "after he was caught stalking her and put on leave by the Santa Fe Police Department," Valdez's stalking escalated.  The Court recognizes that an equal protection claim may be brought by a "class of one" based on differential treatment motivated by malice rather than a rational basis.  Esmail v. Macrane, 53 F.3d 176 (7th Cir. 1995); Village of Willowbrook v. Olech, 528 U.S. 562, 120 S. Ct. 19073 (2000).  Furgason, however, has presented no evidence that Danny Valdez was put on leave or subjected to adverse job action, nor any evidence as to when or why this may have occurred.  The Court therefore will not consider Furgason's alternative "malignant animosity" theory.

male rather than female.

As of May 1989, the Tenth Circuit "unequivocally held that 'sexual harassment . . . can violate the Fourteenth Amendment right to equal protection of the laws.'"  Woodward v. City of Worland, *supra*, at 1398, *citing* Starrett v. Wadley, 876 F.2d 808 (10th Cir. 1989).  However, Defendant argues that he is entitled to qualified immunity because, as of the date of these incidents (and indeed even now), the law was not clearly established that a person not in a supervisory position over the plaintiff could be liable under the Starrett principle.  The Court rejects this argument.

The point of requiring that the defendant be in a position of authority over the plaintiff is to satisfy the requirement, necessary for any claim under § 1983, that the action be taken "under color of state law."  Most sexual harassment cases arise in the workplace, and the cases requiring some "supervisory authority" to support a sexual harassment / equal protection claim generally involve the problematical situation of claims against co-workers, where "the sexual harassment was not related to 'the powers and duties' of the defendants' jobs or to any 'state authority' conferred upon the defendants."  Woodward, at 1400.

In non-workplace cases, a public official may be liable for an equal protection violation based on sexual harassment, as long as the defendant had some state-derived authority over the plaintiff, such as the power to grant or deny plaintiff a business permit, construction certification, or day-care license.  *See*, *e.g.*, Whitney v. New Mexico, 113 F.3d 1170 (10th Cir. 1997); and Johnson v. Martin, 195 F.3d 1208 (10th Cir. 1999).  The test, therefore, is not whether Valdez exerted supervisory authority over Furgason in the sense of a job supervisor; instead, the relevant inquiry is whether his alleged harassment "involved the use of state authority or position," and constituted a "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed

18

with the authority of state law." <u>Monroe v. Pape</u>, 365 U.S. 167, 183, 81 S. Ct. 473, 482 (1961);

<u>Woodward</u>, at 1400. Nothing in the facts of the case shows that Valdez used his authority as a police

officer, *i.e.*, his gun, badge, uniform, police car or power of this office to intimidate or force Plaintiff

to engage in conduct against her will. Indeed, when the alleged harassment or stalking initially

occurred, Plaintiff was oblivious to Valdez's official position. However, it is also undisputed that

Valdez's access to information came as the direct result of his authority as a police officer to make

a "10-28" inquiry.

As of 1988, the Supreme Court held that "[i]t is firmly established that a defendant in a § 1983

suit acts under color of state law when he abuses the position given to him by the State." <u>West v.</u>

<u>Atkins</u>, *supra*, 487 U.S. at 49-50. And, much earlier on, the Court held that an official acts under

color of state law when "the commission of the wrong itself is rendered possible or is efficiently aided

by the state authority lodged in the wrongdoer." <u>Home Tel. & Tel. Co. v. City of Los Angeles</u>, 227

U.S. 278, 287, 33 S. Ct. 312, 315 (1913).

> The under color of law determination rarely depends on a single,
> easily identifiable fact, such as the officer's attire, the location of the
> act, or whether or not the officer acts in accordance with his or her
> duty . . . Instead one must examine the nature and circumstances of
> the officer's conduct and the relationship of that conduct to the
> performance of his official duties. [Internal punctuation omitted].

<u>David v. City and County of Denver</u>, 101 F.3d 1344, 1353 (10th Cir. 1996) (reversing a qualified

immunity ruling in favor of defendant police officers, who allegedly engaged in sexual harassment and

retaliation against plaintiff, their co-worker).

Valdez cites <u>Haines v. Fisher</u>, 82 F.3d 1503, 1508 (10th Cir. 1996) for the proposition that

acts of police officers "in the gambit [sic] of their personal pursuits are not under color of state law

and do not impose liability," arguing that his actions "were not made possible by his authority as a police officer." [Doc. 50, at 25]. He says he merely watched Furgason while she was in public and left a note on her car, and any person could have done these things. He also contends that "the mere fact" that he traced Furgason's license plate, without her knowledge, in order to learn her name, is insufficient to establish liability under clearly established law.

This argument ignores two facts. One is that there is evidence in this case, which the Court has already found sufficient to raise an issue of fact, that Valdez's actions went well beyond watching Furgason in a public place and leaving a note on her car. The jury could infer that Valdez also stalked Furgason over a period of days or weeks by following her in his vehicle, blocking her vehicle in her own alleyway, parking near her home, and calling her repeatedly and hanging up. The jury could find that the note on the car contained "ominous" overtones, to use Plaintiff's characterization. And, finally, Valdez does not contest the fact that he "ran Furgason's license plate" in order to find out, at the very least, her name. He could also have obtained her address, phone number, and other police information including any outstanding warrants.

Perhaps it is true, as Valdez argues, that he could have learned her identity even if he had not been a police officer. But perhaps he would not have been successful in this unaided effort, whereas he was assured of learning her identity by calling in the license registration. And the undisputed fact remains that he did not go about learning her identity by use of the ordinary means available to a private person, such as simply approaching her and asking her name; rather, he abused his police authority in order to discover this information, without her knowledge, and he was advancing no governmental interest when he did so.

The Court finds that Valdez's actions were "related to the powers and duties of his job" and

20

"involved the use of state authority or position." Woodward, at 1400.  His admitted misuse of police resources "rendered possible or efficiently aided" his pursuit of an alleged course of  sexual harassment against Furgason; in other words, he "actually used state-conferred authority to accomplish the deed."  Giron v. Corrections Corp. of America, 14 F. Supp. 2d 1245, 1248, 1251 (D.N.M. 1998).  Furgason alleges that Valdez's action made it possible for him to pursue a course of sexual harassment, and she has presented evidence to that effect.  This is sufficient to allow Furgason to take to the jury her claim for violation of her right to equal protection under these circumstances, a right which was clearly established as of the date of Valdez's actions.

The Court also rejects Valdez's argument that Furgason has failed to raise an issue of fact regarding Valdez's treatment of men, as opposed to women, in similar circumstances.  Valdez seems to be arguing that Furgason has the burden of demonstrating discriminatory intent by showing that Valdez would not have reacted with sexually suggestive notes, and stalking behavior,  toward a man whom he glimpsed adjusting his sweat pants in a public place.  But Furgason does not carry such a burden; as the Second Circuit made clear in 1993:

> [Plaintiff] has properly grounded a Section 1983 claim on the Equal Protection Clause.  This Court, like our sister circuits, has upheld a Section 1983 claim against a public official for improper sexual conduct toward an employee that created a hostile work environment.  [Here the court cites several cases, including the Tenth Circuit's Starrett v. Wadley].  Perhaps some public employers sexually harass both men and women, but until an employer has the audacity to advance such a defense, sexual harassment of women constitutes disparate treatment because of gender, and is actionable under Section 1983.

Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 143-44 (2d Cir. 1993).  *See also*, Roberts v. Air Capitol Plating, Inc., No. 95-1348, 1997 WL 446266 (D. Kan. July 22, 1997) (in denying summary

judgment to a defendant supervisor in a hostile work environment / sexual harassment case, the court found that defendant's expression of "love" for plaintiff in a note was sufficient to raise an issue of fact as to whether defendant's behavior was motivated by plaintiff's gender).

And in Starrett v. Wadley, the seminal Tenth Circuit case establishing a right under the equal protection clause to be free of sexual harassment, the court found that evidence of the defendant's sexual advances toward plaintiff were sufficient to support a conclusion that his "conduct toward plaintiff discriminated against her because of her sex and thereby deprived her of the right to equal protection of the laws." Id., at 815.  The Starrett court did not require any further showing regarding the defendant's treatment of men, nor will this Court.

**C.  Substantive Due Process**

As with her privacy claim, Plaintiff asks the Court to consider her substantive due process claim under the Fourteenth Amendment, rather than the originally-pled Ninth and Tenth Amendments. Finding that the Complaint sufficiently alleges a Fourteenth Amendment violation, the Court grants Plaintiff's request.

"[T]he Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power, or employing it as an instrument of oppression [internal punctuation omitted]." Collins v. City of Harker Heights, 503 U.S. 115, 126, 112 S. Ct. 1061, 1069 (1992) (internal punctuation omitted).  The clause, at its most basic, is "intended to secure the individual from the arbitrary exercise of the powers of government." Hurtado v. California, 110 U.S. 516, 527,  4 S. Ct. 111, 117 (1884).  Among the historic liberties protected by the Fourteenth Amendment's guarantee of substantive due process is "a right to be free from and to obtain judicial relief, for unjustified intrusions on personal security." Ingraham v. Wright, 430 U.S. 651, 673, 97

22

S. Ct. 1401, 1413 (1977).

However, it is not every "intrusion on personal security" by a government official that is actionable under the due process clause.  The test for determining whether government conduct violates a plaintiff's substantive due process rights is a formidable one:

> In order to prevail on their substantive due process claim, Plaintiffs must demonstrate that the state acted in a manner that "shocks the conscience" [*citing* Collins v. city of Harker Heights, *supra*] . . . [and] to satisfy the "shock the conscience" standard, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power.  That is, the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.  The level of conduct required to satisfy this additional requirement cannot precisely be defined, but . . . [w]e do know, however, that the "shock the conscience" standard requires a high level of outrageousness . . ..

Uhlrig v. Harder, 64 F.3d 567, 571, 574 (10th Cir. 1995).   To pass this test, the actions alleged must violate the decencies of civilized conduct, and be so brutal or offensive that they violate traditional ideas of fair play and decency, "shocking to the universal sense of justice."  County of Sacramento v. Lewis, 523 U.S. 833, 846, 850, 118 S. Ct. 1708 (1998).

In determining whether particular actions of a public official meet this test, the Court must be wary of expanding the concept of substantive due process, "because guideposts for responsible decisionmaking [sic] in this unchartered area are scarce and open-ended."  Collins v. City of Harker Heights, *supra*, at 125.  "Thus, we have made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."  County of Sacramento v. Lewis, *supra* 523 U.S. at 848.  *See also*,  Radecki v. Barela, 146 F.3d 1227, 1230 (10th Cir. 1998).

After careful consideration of the facts as presented by the parties, and court rulings in similar cases, the Court concludes that even accepting all of Plaintiff's allegations as true, the actions of Danny Valdez do not rise to the level of the sort of outrageous, egregious, and offensive behavior that would support a claim for violation of Furgason's substantive due process rights.

In order to support a substantive due process claim, the Tenth Circuit generally requires something more extreme than verbal abuse, or even threats causing severe emotional distress. For example, in 1987, the court found a substantive due process violation by a school teacher for excessive corporal punishment against a 9-year-old student in a situation involving severe physical injuries. In Garcia ex rel. Garcia v. Miera, 817 F.2d 650, 654, 655 (10th Cir. 1987), the defendant teacher struck the student five times with a wooden paddle that was split down the middle, while another teacher held the student upside down by her ankles. This beating left a permanent scar on the child's leg. In a separate incident, the teacher again struck the student with the same split paddle, after subduing her in a struggle that resulted in injuries described by a treating nurse as child abuse. The court held that, while "ordinary corporal punishment violates no substantive due process rights of school children, . . . at some point of excessiveness or brutality, a public school child's substantive due process rights are violated by beatings administered by government-paid school officials" and this was such a case. Id., at 655.

However, in Abeyta v. Chama Valley Indep. Sch. Dist., 77 F.3d 1253 (10th Cir. 1996), the court rejected a substantive due process claim in a case where a teacher ridiculed a 12-year-old female student over a period of a month and a half by repeatedly calling her a prostitute in front of her sixth-grade class, after the teacher intercepted an innocent note written by the student. The plaintiff in Abeyta argued that the teacher violated her "substantive due process rights to be free from invasion

24

of her personal security by sexual abuse and harassment and by psychological abuse."  However, the court noted that "even extreme verbal abuse typically is insufficient" to establish a substantive due process deprivation, citing Collins v. Cundy, 603 F.2d 825 (10th Cir. 1979), in which the court found no constitutional deprivation in a verbal abuse case wherein a sheriff laughed at a prisoner and threatened to hang him.  The court held in Abeyta:

> Here, defendant's conduct as alleged certainly was harassing, and we must accept that it directly inflicted emotional harm on plaintiff . . . There were no allegations, however, of sexual assault, molestation, or touching of any sort . . .  We can imagine a case where psychological harassment might be so severe that it would amount to torture equal to or greater than the stomach pumping abuse condemned in Rochin [v. California, 342 U.S. 165, 72 S. Ct. 205 (1952)].  But we are sure that the actions alleged in the instant case do not reach that level . . .

Id., at 1256, 1258.

And in another school case, the Tenth Circuit held that a teacher who forced a mentally handicapped child to clean out a toilet with his bare hands and thereby subjected him to ridicule by his classmates, after mistakenly thinking the student had confessed to purposely clogging the toilet, exhibited poor judgment; however, the behavior was not "so excessive, demeaning, and inhumane as to be a substantive violation of his Fourteenth Amendment Due Process Rights."  Harris v. Robinson, 273 F.3d 927, 931 (10th Cir. 2001).

In Uhlrig v. Harder, *supra*, the Tenth Circuit again rejected a plaintiff's contention of a substantive due process violation based on the actions of state officials who moved a dangerous mental patient out of a ward reserved for the criminally insane and put him into the general hospital population, where he killed a hospital activity therapist.  The court noted that the constitutional protection against "conscience shocking" behavior traditionally involves only deliberately wrongful

25

government decisions rather than negligent conduct, and "a § 1983 violation must be predicated on

a state action manifesting one of two traditional forms of wrongful intent – that is, either (1) an intent

to harm; or (2) an intent to place a person unreasonably at risk of harm."  Id., at 573.

Radecki v. Barela, 146 F.3d 1227 (10th Cir. 1998), involved police behavior, although unlike

the present case which revolves around intentional police conduct, the actions alleged in Radecki

were reckless or exhibited deliberate indifference to the safety of plaintiff's decedent.  In Radecki, a

deputy sheriff was alleged to have created a dangerous situation that resulted in the death of a civilian

bystander.  The court found that the deputy's conduct did not "shock the conscience," and rejected

plaintiff's contention that a "constitutional violation arose from Deputy Barela's decision to involve

a bystander, Radecki, in the dangerous struggle for the gun, and then to abandon him once Martinez

[the alleged perpetrator of a rape] had gained control of the firearm."  Id., at 1230.

In an unpublished case, also dealing with police behavior, the Tenth Circuit again rejected a

plaintiff's substantive due process claim where the evidence, viewed in the light most favorable to

plaintiff, was that a police officer pushed plaintiff with his forearm, yelled at him, and shook papers

in his face.  The court held that this conduct did not rise to the level of conscience-shocking behavior,

in spite of the physical contact.  Ellis v. City of Lindsay, No. 98-6153, 1998 WL 879818 (10th Cir.

Dec. 17, 1998).  And more recently, in Livsey v. Salt Lake County, 275 F.3d 952 (10th Cir. 2001),

the court found that a sheriff's gratuitous comment to the press speculating about a murder victim's

sexual practices, and the subsequent failure to grant a name-clearing hearing, was not so shocking

as to violate substantive due process principles:  "The defendants' conduct, however ill-advised,

inappropriate, or ill-considered it might have been, does not 'shock the conscience of federal judges.'"

Id., at 958.

Finally, in a case this year, the Tenth Circuit held that the actions of social workers in attempting to remove an allegedly abused child from his home, while accompanied by police officers, did not violate Fourteenth Amendment substantive due process principles. In <u>Roska ex rel. Roska v. Peterson</u>, 328 F.3d 1230, 1243 (10th Cir. 2003), the court held:

> While we express some doubt as to the need to push or swear at adolescent girls, use of such force to move children who might be interfering with the removal of a child from the home is not so disproportionate as to rise to the level of a liberty violation within the meaning of the Due Process clause. Additionally, no serious physical injury was inflicted . . .

Viewing the facts in the present case in the light most favorable to plaintiff, Valdez's actions consist of driving by her car on more than one occasion while she was working out in a public park, calling the police dispatcher to have her automobile registration checked so that he could find out her name, leaving a note on her car mentioning he had seen her underwear when she adjusted her sweat pants and commenting on her beautiful body, placing telephone calls to her home and hanging up on numerous occasions, parking near her home and watching her from his vehicle, and aggressively following her in his vehicle as she drove around town doing errands, and blocking her exit from the alleyway leading to her house.[7]

Although this behavior, if true, is reprehensible and constitutes an abuse of Valdez's authority as a police officer, the Court cannot say that it meets the stringent substantive due process test, as defined by the Tenth Circuit. There is no allegation of physical injury, or even physical contact between Valdez and Furgason. This is not to say that the Court is impressed with Valdez's argument

---

[7]As noted above, Valdez admitted that he obtained Plaintiff's driver's registration information from the city's police dispatch operator, and he admitted leaving the note on Plaintiff's car and driving to the bike park/jogging lane twice. He denied all other claims relating to Plaintiff's assertions of stalking.

that his actions were completely harmless and amounted to nothing more than a man complimenting a woman he found attractive.  Valdez used his police authority to discover Furgason's identity, and presumably her home address and phone number.  In addition, the Court agrees with Furgason's characterization of the note as "ominous" to any woman, referring as it does to the color of her underwear and her "beautiful body," and including the information that the author of the note, who at that point was anonymous, cannot stop thinking about her.  Nevertheless, in this Circuit, even severe verbal harassment does not generally rise to the required constitutional level without indication of a specific intent to harm or to place plaintiff in danger, or without a physical injury or molestation.  In the Tenth Circuit, behavior which is merely "ill-advised, inappropriate, or ill-considered" does not shock the conscience.

This conclusion is bolstered by the weight of authority from other circuits in cases involving police misconduct and/or sexual harassment as a violation of substantive due process rights.  Courts are most likely to find such a violation when the police conduct invades the bodily integrity of the plaintiff.

*See, e.g.*, the following cases, in which male police officers used their position of authority over female suspects to enter their homes, or restrain them in a police vehicle, and rape them. Bennett v. Pippin, 74 F.3d 578 (5th Cir. 1996) (sheriff raped a woman who had just shot her husband during a violent domestic dispute); Jones v. Wellham, 104 F.3d 620 (4th Cir. 1997) (police officer stopped the plaintiff on "ostensible suspicion of DWI," told her he would drive her home, but instead took her to a church parking lot and raped her); and Rogers v. City of Little Rock, 152 F.3d 790 (8th Cir. 1998) (police officer stopped a female driver for a broken tail light, then followed her home and raped her).  In Rogers, the court found that the plaintiff "suffered a violation of her right to intimate

28

bodily integrity that was conscience shocking.  This case involves an egregious, nonconsensual entry into the body which was an exercise of power without any legitimate governmental objective").  *See also,* <u>Fontana v. Haskin</u>, 262 F.3d 871 (9th Cir. 2001), in which the plaintiff was not raped but was subjected to sexual comments and touching by an arresting officer while she was handcuffed in the back of a police car. The court noted that defendant's "sexual predation was 'unjustifiable by any government interest,'" and the behavior was "egregious and outrageous and shocks the conscience as a matter of law." <u>Id.</u>, 882 n.7.

The allegations in <u>Haberthur v. City of Raymore</u>, 119 F.3d 720 (8th Cir. 1997) are more similar to the present case, as they involve instances of stalking.  The police officer in <u>Haberthur</u> followed the plaintiff in his police car, drove repeatedly past her house in both a police car and his own vehicle, and showed up at the store where she worked while he was on duty and in uniform, on one of these occasions placing his hands under her clothing and fondling her breasts while making sexually suggestive remarks.  On two occasions, he threatened that he might give her a ticket.  The trial court dismissed plaintiff's substantive due process claim, finding that the behavior was not so "brutal or demeaning" as to shock the conscience.   The court of appeals reversed, finding the behavior "intrusive, demeaning, and violative of her personal integrity.  the implication for further sexual contact was in the larger context of threatening adverse official action by way of a ticket and following her in his police car.  He was in uniform and on duty throughout." <u>Id.</u>, at 724.

Police behavior less egregious than that involved in the above cases has been held not to violate substantive due process.  For example, in <u>Bristow v. Clevenger</u>, 29 Fed. Appx. 813  (3d Cir. Feb. 22, 2002), plaintiff alleged that her ex-husband, a police officer, while on duty and in uniform, was guilty of stalking and harassing her in rather vague ways including verbal threats and abuse,

following her, and using "unpleasant facial expressions." She claimed that this stalking was done in retaliation for her having successfully sued him in an earlier civil rights action. The trial court dismissed the complaint, finding no valid substantive due process claim, and the court of appeals impliedly agreed that "the alleged harassment was [not] sufficiently serious to trigger substantive due process concerns. Id., at 815.

Furgason's situation is more akin to that of the plaintiff in Bristow than in the other cases described above. There was no physical contact between Furgason and Valdez, she was not touched or spoken to inappropriately or in a threatening manner while under physical restraint, and there is no proof of an intent to harm, or to place Plaintiff at risk of harm. The Court does not find that a woman must be assaulted in order to make out a case of egregious, shocking police behavior; however, the allegations made in this case against Danny Valdez do not rise to the level set by the Tenth Circuit and other courts for finding a substantive due process violation. Compared to other instances of police misbehavior, particularly those cases involving physical sexual assault, and considering the Supreme Court's admonition to refrain from undue expansion of the concept of substantive due process, the Court finds that the actions alleged herein, while repugnant, do not rise to the "egregious," "shocking," "brutal" or "offensive" level which would support a claim for substantive due process violation.

And there being no constitutional violation under this cause of action, the Court need not reach the issue of qualified immunity. See, County of Sacramento v. Lewis, 523 U.S. at 841 n.5; Christiansen v. City of Tulsa, 332 F.3d 1270, 1278 (10th Cir. 2003) (the court should first determine whether plaintiff sufficiently alleges the violation of a constitutional right, and only then consider qualified immunity). The Court therefore grants Valdez's motion for summary judgment on this

claim.

At first blush, it may seem incongruous that the Court finds that Valdez's alleged conduct can, on the one hand, violate Furgason's constitutional right of privacy and equal protection, and the same conduct, on the other hand, is insufficient to violate Furgason's Fourteenth Amendment substantive due process rights.  Indeed, if the conduct, while reprehensible, does not meet the conscious-shocking standard for Fourteenth Amendment purposes, it would seem that the conduct should not warrant a finding of constitutional violation for any other purpose.  Suffice to say that  there is no legal inconsistency.  The standards for finding a violation of privacy rights and equal protection are not as stringent as those for finding a substantive due process violation.

## Order

IT IS THEREFORE ORDERED that Valdez's Motion for Partial Summary Judgment II [Doc. 50] is denied in part, to the extent it seeks dismissal of Plaintiff's Fourteenth Amendment claims based on the constitutional right to privacy, and equal protection of the law.

IT IS FURTHER ORDERED that Valdez's Motion for Partial Summary Judgment II [Doc. 50] is granted in part, to the extent it seeks dismissal of Plaintiff's Fourteenth Amendment claim based on substantive due process, and that claim is hereby dismissed with prejudice;

_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge